FENN, District Judge.
[¶1] Appellants, Ronald Stevens and High Plains Anesthesia, P.C., appeal from the Judgment on Jury Verdict , Order on Summary Judgment , and Order Denying Stay and Motion for Judgment as a Matter of Law . Appellants assert that the district court improperly granted summary judgment, erred in refusing to admit certain evidence at trial, and erred in refusing to grant their post-trial motion for judgment as a matter of law. We affirm in part, reverse in part, and remand for further proceedings.
ISSUES
[¶2] Appellants phrase the issues as follows:
1. Did the District Court err in granting summary judgment to ACC on the breach of fiduciary duty claims because there were issues of material fact as to whether the Eye Surgery Center amounted to a protectable and continuing "corporate opportunity" for ACC?
2. In the alternative, did the District Court err by granting summary judgment to ACC on the breach of fiduciary duty claims because Dr. Stevens had given notice *1274 to ACC and ACC ratified Dr. Stevens' actions and/or rejected the opportunity?
3. Regardless of whether the Eye Surgery Center amounted to a "corporate opportunity," was the arrangement between Cassandra Rivers and ACC a violation of the Federal Anti-Kickback law, and is thus illegal and unenforceable as a matter of law?
4. Did the District Court err in granting summary judgment to ACC on Dr. Stevens' Defamation claim because there were issues of material fact regarding whether Dr. Dorrough abused the conditional privilege and spoke with malice?
5. Did the District Court abuse its discretion and commit prejudicial error at trial when it refused to admit Dr. Stevens' December 11, 2013 email and the July 17, 2014 email between Drs. Dorrough and Skolnick?
Appellees phrase the issues as follows:
1. The manager of a limited liability company owes a duty of loyalty to the company that includes a duty not to compete with, or appropriate an opportunity from, the company. While a manager of ACC, Dr. Stevens both competed with ACC and appropriated a company opportunity. Did Dr. Stevens breach his duty of loyalty to ACC?
2. A company opportunity exists when the company has an actual or expected interest in, and ability to acquire, the property or asset. ACC had a longstanding business-relationship with the Cheyenne Eye Surgery Center as well as an established history of revenue from the relationship. Does ACC's longstanding business-relationship constitute a company opportunity?
3. A manager's duty of loyalty requires him to fully disclose all material facts relating to company opportunities he intends to appropriate. Dr. Stevens sent an email to ACC's billing provider, copying ACC's other managers, stating he intended to "carve out" certain of his services from ACC. Did this email referencing a carve-out constitute full disclosure of all material facts relating to the appropriation of the company opportunity?
4. A company can only approve, reject, or ratify a manager's appropriation of a company opportunity if that opportunity has been fully disclosed to the members of the company. Dr. Stevens' email to ACC's billing provider (copied to two managers) did not disclose any material facts relating to the company opportunity he appropriated. Did ACC ratify Dr. Stevens' appropriation of the company opportunity?
5. Privileged or substantially true communications do not constitute defamation. Dr. Dorrough's statement to his colleagues that Dr. Stevens had diverted income from ACC was both privileged and true. Did Dr. Dorrough defame Dr. Stevens?
6. Irrelevant evidence is inadmissible and evidence that will confuse or distract the jury can be excluded. The December 11, 2013 Copied-To-Email and the July 17, 2014 Post-Discovery Emails were irrelevant and would have confused or distracted the jury. Did the District Court abuse its discretion in excluding the emails?
7. The failure to raise an issue before the District Court precludes this Court from considering it on appeal. The Appellants failed to raise the issue of whether an agreement between Cassandra Rivers and ACC violated federal anti-kickback law before the District Court. Should this Court consider the issue for the first time on appeal?
8. Is the Appellants' argument that an agreement between Cassandra Rivers and ACC violates federal anti-kickback law applicable to the facts of this case?
FACTS
[¶3] In 1999, a group of anesthesiologists in Cheyenne formed Anesthesiology Consultants of Cheyenne, LLC ("ACC"). The members of ACC typically provided anesthesiology services at Cheyenne Regional Medical Center ("CRMC") and High Plains Surgery Center. ACC also provided services to a group of Cheyenne ophthalmologists, who generally performed surgery on their patients at either CRMC or High Plains Surgery Center. Some of the members of ACC had performed anesthesiology services for the ophthalmologists even before 1999.
[¶4] Appellant, Dr. Ronald Stevens, joined ACC in 2001. Dr. Stevens had previously *1275 been an anesthesiologist in Denver, Colorado, and he had been a manager of a much larger group of anesthesiologists in that state before relocating his practice to Cheyenne. Shortly after moving to Cheyenne, Dr. Stevens met Cassandra Rivers. Ms. Rivers is a certified registered nurse anesthetist ("CRNA"). Ms. Rivers often performed work for ACC at CRMC, but she did not have a written contract with the company. Dr. Stevens and Ms. Rivers married in 2005.
[¶5] In 2007, several of Cheyenne's ophthalmologists decided to open their own eye surgery center. Dr. Stevens, Ms. Rivers, and possibly other members of ACC assisted the eye surgeons in selecting the proper equipment and setting up their surgery center. The Cheyenne Eye Surgery Center (the "Eye Center") opened in 2008. ACC initially provided anesthesia services at the Eye Center after it opened. However, ACC also had a contract with CRMC that required it to provide a certain number of physicians and/or CRNAs who would be available to cover the hospital's anesthesiology cases. Thus, it was sometimes difficult to have enough anesthesiologists to provide coverage for CRMC, High Plains Surgery Center, and the Eye Center. This meant that some cases at the Eye Center were missed. Around the time the Eye Center opened, Ms. Rivers was looking for a position that would give her shorter hours. Dr. Stevens suggested to the members of ACC that Ms. Rivers provide services at the Eye Center when needed, and continue to work at CRMC a couple of days each week. ACC would bill for her work there, pay her an hourly rate, and keep the rest of the income. ACC accepted this arrangement, and Ms. Rivers started providing services at the Eye Center in April of 2008. Ms. Rivers was scheduled to be at the Eye Center three days a week and at the hospital the other two days. There was no written agreement either between ACC and the Eye Center or between ACC and Ms. Rivers. However, for the next several years, ACC billed for Ms. Rivers' services at the Eye Center, paid her an hourly rate, and kept the rest of the income. On average, ACC kept slightly more than half of the income that was generated at the Eye Center.
[¶6] ACC gave Ms. Rivers minimal, if any benefits, other than providing billing services. Ms. Rivers' work was directly supervised by the ophthalmologists at the Eye Center. In May 2009, Ms. Rivers became an employee of Dr. Stevens' company, High Plains Anesthesia, P.C. When this change occurred, ACC paid Ms. Rivers' hourly wage to High Plains Anesthesia instead of directly to Ms. Rivers. High Plains Anesthesia then paid Ms. Rivers an hourly rate. High Plains Anesthesia paid Ms. Rivers' worker's compensation and unemployment premiums and it issued her a W-2 for the income she received. ACC continued to retain roughly half of the income from the services Ms. Rivers provided at the Eye Center.
[¶7] In 2013, the members of ACC executed the Restated Operating Agreement of Anesthesiology Consultants of Cheyenne, LLC ("Operating Agreement") and a Distribution Agreement. At the time these documents were executed, Dr. Stevens was a manager of ACC, along with Dr. Skolnick and Dr. Wallace. These documents provided that patients would be assigned to a member of ACC on a random, rotating basis. The physicians would then pool all of the money they collected from their cases, and after adjustments were made for group expenses, the physician members would be paid $25 for every one "unit of work." The Distribution Agreement set out how many units of work a physician would be paid for a certain type of procedure. This system was designed to allow the physicians to share in the available revenue and eliminated any incentive to avoid patients in low-paying categories or to seek out only the best paying cases.
[¶8] Some anesthesiologists, like Dr. Stevens, receive training in pain management. Dr. Stevens' practice with ACC included traditional anesthesia services, as well as pain management. Most of Dr. Stevens' pain patients were Medicare patients or patients who were on disability, and ACC was not able to collect full payments for many of these cases. This meant that pain management cases were not very profitable for ACC and did not generate as much income as other types of procedures. In November of 2013, one of the members of ACC suggested that the pain management practice should be *1276 divorced from or "carved out" of ACC's shared income pool.
[¶9] A meeting to discuss this "carve out" was held on November 25, 2013. Prior to the meeting, Dr. Stevens told Dr. Dorrough that he did not want to carve out the pain practice, and that he did not believe the members could vote to change the Distribution Agreement to carve out a specific class of procedures. Dr. Stevens also expressed this opinion to the group at the meeting. He proposed that another option would be for the group to limit the shared revenue to that received from procedures done at CRMC and High Plains Surgery Center. He may have also said that Ms. Rivers was "leaving a lot of money on the table." No official vote was taken at this meeting, but it was clear that several of the members believed that the pain practice should be carved out.
[¶10] On December 10, 2013, Amy Hayes of the Office Assistant, ACC's billing provider, sent an email to the managers of ACC, Drs. Stevens, Dorrough, and Skolnick, asking whether the pain practice was going to be carved out and, if so, what date that was to begin. She recommended a transition date of January 1, 2014. Dr. Stevens replied to Ms. Hayes and copied Drs. Dorrough and Skolnick. He wrote:
In light of the consistent and persistently expressed wishes of the rest of the group members, and for the purpose of expressing this to you clearly, I have decided to implement the "carveout" as follows: I will continue to personally provide services, through my PC, to the group. This will encompass all work done at the hospital under the contract, as well as "traditional" anesthesiology services at High Plains Surgery Center. All other practice areas, including "the pain practice", and provision of services done by myself or employees elsewhere, will be billed and collected directly through my long-standing corporation, High Plains Anesthesia, PC, which will make its own arrangements for contracting, billing, and collecting. January 1, 2014 will mark the beginning of this separation.
It appears that neither Dr. Dorrough nor Dr. Skolnick read this email when it was initially sent. Dr. Stevens later asked them if they had received his email and had any questions about it. They told him that they had received it, and that everything was okay. Drs. Dorrough and Skolnick later testified that they believed this email only involved the voluntary carve out of the pain practice, and they were amenable to that being carved out as of January 1, 2014.
[¶11] On January 1, 2014, ACC stopped receiving the income from the Eye Center, and it was deposited into High Plains Anesthesia's account. Ms. Rivers continued to work at CRMC on Mondays and Fridays, and she submitted her invoices to ACC for this work. These invoices no longer showed her work at the Eye Center on Tuesdays, Wednesdays, and Thursdays. The invoices were submitted as they had been in the past, and they were signed either by Drs. Stevens, Dorrough, or Skolnick.
[¶12] On June 20, 2014, Dr. Dorrough noticed that ACC was no longer receiving the income from the Eye Center. He approached Dr. Stevens to ask why Ms. Rivers had stopped sending her invoices for this work to ACC. In response, Dr. Stevens reminded Dr. Dorrough about his December 11, 2013 email. Dr. Stevens printed this email for Dr. Dorrough and underlined the section where he had told them that he would be carving out all work done by his employees. Dr. Dorrough then admitted that he had not read the email when it was originally sent. Dr. Dorrough told Dr. Stevens that he was going to schedule a meeting so that the situation could be discussed with all of the members of ACC.
[¶13] After speaking with Dr. Stevens, Dr. Dorrough went to some of the members and told them that Dr. Stevens had diverted the money from the Eye Center to his personal PC without notice. After speaking with Dr. Dorrough, some of the members believed that Dr. Stevens had committed a criminal act. The members held a meeting on July 8, 2014, to discuss the situation, and they voted 9-3 to expel Dr. Stevens from ACC.
[¶14] After Dr. Stevens had been expelled from ACC, he informed Dr. Dorrough that he and Ms. Rivers would like to keep the business from the Eye Center. Dr. Dorrough wrote an email to Dr. Skolnick which read in relevant part:
*1277 3) Eye Center-[Dr. Stevens] and Cassie would like to keep the eye center and are wondering what our intentions are? I see this as not a major deal because in order to make the eye center profitable for us, we would have to recruit another CRNA. If we have to bring in more locums in order to keep the eye center staffed, it may not be much of a benefit to us, and would certainly generate more friction. (Locums might be $2,000/day and the eye center is worth about $1300/day).
Dr. Skolnick responded as follows:
I think it's okay to give [Dr. Stevens] the Eye Center, but I think we still need to keep our hat in the rink. I will give them a call and clearly state that we don't want to take over, but if they ever need help or [are] unhappy with [their] current arrangement that we would maybe be able to work something out. Thoughts?
[¶15] In August of 2014, ACC sent Ms. Rivers a letter that her services were no longer needed at CRMC. After her work with ACC ceased, Ms. Rivers continued to provide services at the Eye Center. High Plains Anesthesia continued to bill for her work, paid her an hourly wage, and kept the rest of the income. ACC did not actively pursue the Eye Center's business after expelling Dr. Stevens from the group. One or more members of ACC did contact the Eye Center to let them know that ACC was willing to provide anesthesiology services. However, these communications were characterized as "advertisements" by Dr. Dorrough, and no one from ACC ever contacted the Eye Center to inform them that ACC thought it had an exclusive arrangement with the Eye Center, and that it was a violation of this agreement to use Ms. Rivers' services. In addition, ACC did not attempt to replace Ms. Rivers with another CRNA who could have covered the Eye Center.
[¶16] After Dr. Stevens was expelled from ACC, he was no longer placed on the rotation at CRMC, and he was only allowed to perform services there if a patient or physician expressly requested him. In addition, some of the members of ACC actively discouraged other physicians from requesting Dr. Stevens. Members of ACC also discussed pursuing criminal prosecution of Dr. Stevens.
[¶17] ACC filed suit against Dr. Stevens and Ms. Rivers on February 13, 2015. ACC's Amended Complaint alleged nine causes of action: 1) breach of fiduciary duties; 2) breach of the covenant of good faith and fair dealing; 3) breach of contract; 4) conversion; 5) constructive fraud; 6) fraud; 7) intentional interference with a contract and/or prospective economic advantage; 8) civil conspiracy; and 9) punitive damages. All of these causes of action alleged that ACC had been harmed by Dr. Stevens' diversion of the income from the Eye Center, and ACC was entitled to damages incurred as a result of this conduct.
[¶18] Dr. Stevens counterclaimed against Drs. Dorrough, LeBeaumont, Milmont, Skolnick, and Rodriguez-Morvelli as the members of ACC. He initially alleged three causes of action: 1) interference with a contract and interference with prospective economic advantage; 2) breach of the covenant of good faith and fair dealing; and 3) breach of contract. His counterclaim was subsequently amended to allege claims of defamation and intentional interference with a contract against Dr. Dorrough individually. Dr. Stevens alleged that ACC had wrongfully expelled him from the group, and some of the members were interfering with his ability to provide anesthesia services in the regular rotation, after he had been expelled from the group. Dr. Stevens also alleged that Dr. Dorrough's statements to the members of ACC were defamatory, that he made the statements with actual knowledge that they were false and that, as a result of the statements, members of ACC had restricted his practice in hopes that he would leave town.
[¶19] ACC moved for summary judgment on its first three causes of action, and the counterclaim defendants moved for summary judgment on all of Dr. Stevens' counterclaims. Approximately two weeks before trial, the district court granted the motions for summary judgment. The district court found Dr. Stevens had breached his fiduciary duties as a manager of a LLC as set out in Wyo. Stat. Ann. § 17-29-409. Specifically, the court found that Dr. Stevens had breached his duty of loyalty by appropriating a LLC opportunity and competing with ACC. In addition, the district court found that Dr. Stevens had *1278 violated his statutory duty of care and the covenant of good faith and fair dealing. The district court concluded that ACC was justified in expecting to continue receiving profitable business from the Eye Center as it had done since 1999. The district court also determined that Dr. Stevens had breached the Operating Agreement by using his separate entity to compete with ACC. The district court found that Dr. Stevens had violated his contractual duty of loyalty, as set out in Section 1.2(o) of the Operating Agreement, and Section 3.7, which stated that a manager was required to manage the company as the manager's sole and exclusive function with the exception of practicing medicine.
[¶20] The district court also ruled that summary judgment was appropriate on Dr. Stevens' counterclaim of interference with a contract and prospective economic advantage, because Dr. Stevens did not have any contractual relationships or business expectancies outside of those he had had as a member of ACC. The district court decided that ACC had not breached the covenant of good faith and fair dealing, because the Operating Agreement specifically allowed a two-thirds majority of the members to vote to expel Dr. Stevens from the group, with or without cause. The district court also found that expelling Dr. Stevens from the group pursuant to the Operating Agreement was not a breach of contract. In addition, the district court concluded that Dr. Stevens' defamation claim could not survive summary judgment, because Dr. Dorrough's statement was subject to a conditional privilege, and Dr. Stevens had not produced any evidence that the statement was made with malice. Because the district court had already found that ACC had a contractual right to expel Dr. Stevens from the group, it also concluded that Dr. Stevens' claim against Dr. Dorrough for interference with a contract or prospective business advantage likewise could not survive summary judgment.
[¶21] After the summary judgment ruling, ACC decided not to pursue the remaining causes of action, and the case proceeded to trial solely on the issue of damages. At the trial, Dr. Stevens asserted that ACC was not entitled to any damages, because Ms. Rivers had unilaterally decided to stop working with ACC. He argued that she was not an employee, did not have a contract with ACC, and she was free to keep all of the revenue from the Eye Center for herself. Dr. Stevens also sought to introduce his December 11, 2013 email, and the July 2014 emails between Drs. Dorrough and Skolnick as evidence that ACC failed to mitigate its damages. The district court excluded the December 2013 email on the grounds of relevance and the July 2014 emails on the grounds that they were speculative and irrelevant. Ultimately, the jury returned a verdict in ACC's favor in the amount of $320,000.00.[1]
[¶22] After the trial, the claims against Ms. Rivers were dismissed. Dr. Stevens filed a Motion for Judgment as a Matter of Law or for a New Trial . He asserted that the damages were substantially in excess of the maximum which could be allowed by the evidence presented by ACC, and the district court had committed prejudicial error by excluding evidence that would have established that ACC failed to mitigate its damages. This motion was denied, and a judgment was entered based on the jury's verdict.
[¶23] Dr. Stevens then filed a Motion for Judgment as a Matter of Law . He argued for the first time that the arrangement between Ms. Rivers and ACC violated the Federal Anti-Kickback Statute and was, therefore, illegal and unenforceable. ACC asserted that Dr. Stevens had waived the defense of illegality because it had not been properly pled, illegality did not apply because they were not seeking to enforce a contract with Ms. Rivers, and the Anti-Kickback Statute did not apply to the facts of this case. The district court denied the motion, finding that the *1279 defense of illegality had not been pled, Dr. Stevens had not offered any justification for inserting it at that late phase of the litigation, and he had done so in bad faith. The district court also found that even if the contract was found to be illegal, it would not have been voided retroactively, and it was not proper for the court to invalidate the jury's verdict. This appeal followed.
STANDARD OF REVIEW
[¶24] Dr. Stevens is appealing the district court's ruling on summary judgment. Summary judgment is governed by W.R.C.P. 56(c), which provides:[2]
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
This Court reviews a district court's summary judgment decision de novo without giving any deference to the district court's determinations. Cathcart v. State Farm Mut. Auto. Ins. Co. , 2005 WY 154, ¶ 11, 123 P.3d 579, 586 (Wyo. 2005) (quoting Baker v. Ayres & Baker Pole and Post, Inc. , 2005 WY 97, ¶ 14, 117 P.3d 1234, 1239 (Wyo. 2005) ). "Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present." Braunstein v. Robinson Family Ltd. Partnership , 2010 WY 26, ¶ 16, 226 P.3d 826, 833 (Wyo. 2010). "The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law." McGarvey v. Key Property Management , 2009 WY 84, ¶ 10, 211 P.3d 503, 506 (Wyo. 2009). A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. Schuler v. Community First Nat'l Bank , 999 P.2d 1303, 1304 (Wyo. 2000). The Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. The record is viewed from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. Caballo Coal Co. v. Fidelity Exploration & Production Co. , 2004 WY 6, ¶ 7, 84 P.3d 311, 313-14 (Wyo. 2004). "If upon review of the record, doubt exists about the presence of issues of material fact, that doubt must be resolved against the party seeking summary judgment." Lawrence v. City of Rawlins , 2010 WY 7, ¶ 12, 224 P.3d 862, 867 (Wyo. 2010) (citing Roussalis v. Wyoming Medical Center, Inc. , 4 P.3d 209, 229 (Wyo. 2000) ).
[¶25] Dr. Stevens is also appealing the district court's denial of his motion for judgment as a matter of law. This Court has previously explained the standard that applies to a review of a trial court's decision to grant a motion for judgment as a matter of law:
In reviewing a judgment as a matter of law, we evaluate the record without affording deference to the trial court's views. John Q. Hammons Inc. v. Poletis , 954 P.2d 1353, 1356 (Wyo. 1998) ; Hatch v. State Farm Fire and Casualty Company , 930 P.2d 382, 395 (Wyo. 1997). A judgment as a matter of law is appropriate when reasonable jurors could reach but one conclusion as to the verdict. Hatch , 930 P.2d at 395. We regard the nonmoving party's evidence as being true, and we give that party the benefit of all reasonable inferences that may be drawn from the evidence. Garaman, Inc. v. Williams , 912 P.2d 1121, 1123 (Wyo. 1996). Additionally, we do not weigh the evidence or assess the credibility of the witnesses. John Q. Hammons Inc. , 954 P.2d at 1356. A judgment as a matter of law deprives the opposing party of the opportunity to have the jury determine the facts, and the court should, *1280 therefore, use caution in granting such a judgment. Id. ; Hatch , 930 P.2d at 395.
Anderson v. Duncan , 968 P.2d 440, 442 (Wyo. 1998). We have also said:
Our standard of review is the same whether it arises in the procedural context of a motion for judgment as a matter of law prior to the submission of the case to the jury (formerly, a motion for a directed verdict) or in the context of a renewed motion for judgment as a matter of law after the jury has returned a verdict (formerly, a motion for judgment notwithstanding the verdict). We undertake a full review of the record without deference to the views of the trial court. The test to be applied is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached. We view the evidence in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences that may be drawn from the evidence. When the facts permit the drawing of more than one inference, it is for the jury to choose which will be utilized. Since a judgment as a matter of law deprives the party opposing the motion of a determination of the facts by a jury, it should be cautiously and sparingly granted.
Rudy v. Bossard , 997 P.2d 480, 485 (Wyo. 2000) (quoting John Q. Hammons Inc. v. Poletis , 954 P.2d 1353, 1356 (Wyo. 1998) ) (citations and footnote omitted).
[¶26] Dr. Stevens is also appealing the district court's decision to exclude the December 2013 and July 2014 emails. A district court's evidentiary rulings are discretionary, and we review them as follows:
A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.
Even if the district court admitted evidence in error, we must consider whether the error was prejudicial or harmless. Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made. Prejudicial error requires reversal, while harmless error does not.
Nelson v. State , 2010 WY 159, ¶ 29, 245 P.3d 282, 289 (Wyo. 2010) (quoting Reay v. State , 2008 WY 13, ¶ 8, 176 P.3d 647, 650 (Wyo. 2008) ) (citations and quotation marks omitted).
DISCUSSION
1. Was Summary Judgment Properly Granted on the Fiduciary Duties Claims?
[¶27] The first issue we must decide is if summary judgment was properly granted on the issue of whether Dr. Stevens breached his statutory fiduciary duties. The Operating Agreement expressly incorporated the fiduciary duties set out in Wyo. Stat. Ann. § 17-29-409 (LexisNexis 2017), which reads:
(a) A member of a member-managed limited liability company owes to the company and, subject to W.S. 17-29-901(b), the other members the fiduciary duties of loyalty and care stated in subsections (b) and (c).
(b) The duty of loyalty of a member in a member-managed limited liability company includes the duties:
(i) To account to the company and to hold as trustee for it any property, profit or benefit derived by the member :
(A) In the conduct or winding up of the company's activities;
(B) From a use by the member of the company's property; or
(C) From the appropriation of a limited liability company opportunity;
(ii) To refrain from dealing with the company in the conduct or winding up of the company's activities as or on behalf of a person having an interest adverse to the company; and
(iii) To refrain from competing with the company in the conduct of the *1281 company's activities before the dissolution of the company.
(c) Subject to the business judgment rule, the duty of care of a member of a member-managed limited liability company in the conduct and winding up of the company's activities is to act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner the member reasonably believes to be in the best interests or at least not opposed to the best interests of the company. In discharging this duty, a member may rely in good faith upon opinions, reports, statements or other information provided by another person that the member reasonably believes is a competent and reliable source for the information.
(d) A member in a member-managed limited liability company or a manager-managed limited liability company shall discharge the duties under this chapter or under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing.
(e) It is a defense to a claim under paragraph (b)(ii) of this section and any comparable claim in equity or at common law that the transaction was fair to or at least not opposed to the limited liability company.
(f) All of the members of a member-managed limited liability company or a manager-managed limited liability company may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty.
(g) In a manager-managed limited liability company, the following rules apply:
(i) Subsections (a), (b), (c) and (e) of this section apply to the manager or managers and not the members;
(ii) The duty stated under paragraph (b)(iii) of this section continues until winding up is completed;
(iii) Subsection (d) of this section applies to the members and managers;
(iv) Subsection (f) of this section applies only to the members;
(v) A member does not have any fiduciary duty to the company or to any other member solely by reason of being a member.
(Emphasis added.) Dr. Stevens asserts that summary judgment should not have been granted on the fiduciary duty claims, because there was a question of fact about whether the business from the Eye Center was a "limited liability company opportunity."
[¶28] While the doctrines of "limited liability company opportunity" and "corporate opportunity" have been codified in this state, our application and discussion of these doctrines has been quite limited. See, e.g. , Farrell v. Hursh Agency, Inc. , 713 P.2d 1174 (Wyo. 1986). We have held:
[A] party claiming breach of fiduciary duty through the appropriation of a business opportunity must
establish that it had an actual or expected interest in an asset or property, and that it had the financial ability to acquire the asset or property. See Collie [v. Becknell ], 762 P.2d [727,] 730 [ (Colo. App. 1988) ]. Even though a corporation might have had some rights with regard to the acquisition of property, in order for that opportunity to be usurped, the acquisition must have been within the corporation's expectation. Three G Corp. v. Daddis , 714 P.2d 1333, 1336 (Colo. App. 1986). Similarly, to establish an expectancy, it is not sufficient for plaintiff to show only that a proposed opportunity possesses value to it, but plaintiff must also show that there is a practical, not a mere theoretical, basis for the opportunity. See Colorado and Utah Coal Co. v. Harris , 97 Colo. 309, 313, 49 P.2d 429[, 431] (1935).
Acorn v. Moncecchi , 2016 WY 124, ¶ 49, 386 P.3d 739, 754-55 (Wyo. 2016) (quoting Astarte, Inc. v. Pacific Indus. Sys., Inc. , 865 F.Supp. 693, 707 (D. Colo. 1994) (emphasis omitted) ).
[¶29] The district court did not make any findings on whether ACC had proven that it had an actual or expected interest in the Eye Center business, or that ACC could have availed themselves of this opportunity without Ms. Rivers' participation. After reviewing the record, we conclude that there are material questions of fact about both prongs of *1282 this test. Unlike its contract with CRMC, ACC did not have a written contract with the Eye Center that gave it the exclusive rights to provide anesthesiology services. In addition, none of the members of ACC could specify what the terms of its alleged agreement with the Eye Center were, and no one ever contacted anyone at the Eye Center to inform them that continuing to use Ms. Rivers' services violated the parties' agreement. Further, there is evidence in the record that ACC was having staffing issues. ACC was required to have a certain number of physicians and CRNAs available at CRMC, which meant that some cases at the Eye Center had been missed before Ms. Rivers began providing coverage for all of the cases at the Eye Center. Thus, there are questions of fact about whether ACC could have availed itself of this opportunity without Ms. Rivers' voluntary participation. There are also numerous questions about what Ms. Rivers' relationship was with ACC. It is unclear from the record if she was an employee of ACC, an independent contractor, or something else entirely. Apparently, Ms. Rivers was free to stop working with ACC at any time, and it is unclear whether ACC would have been able to keep the Eye Center business had she done so. Additionally, the July 2014 emails call into question whether ACC could have financially availed itself of the opportunity. It appears that the Eye Center's business was only profitable if ACC could have recruited another CRNA, something it chose not to do after it terminated Ms. Rivers. As the non-moving party, Dr. Stevens was entitled to receive the benefit of all favorable inferences that could have been drawn from the evidence. When viewed in this light, summary judgment was not appropriate on the corporate opportunity issue.
[¶30] We also conclude that there were questions of fact about whether Dr. Stevens breached his duty of loyalty by competing with ACC. As set out above, Wyo. Stat. Ann. § 17-29-409(b)(iii) prohibits the manager of a LLC from "competing with the company in the conduct of the company's activities before the dissolution of the company." The district court expressly found that Dr. Stevens had breached this duty "by using his own, separate entity to conduct the same business that ACC conducts and provided those services to an existing client of ACC." Viewing the evidence in a light most favorable to Dr. Stevens, there is a question of fact about whether he competed with ACC. As discussed above, there are questions about whether the Eye Center was a LLC opportunity. If ACC could not have availed itself of the opportunity, Dr. Stevens may not have been competing with ACC by taking this opportunity for himself, or allowing his employee to do so.[3] Thus, there is also a question of fact about whether Dr. Stevens breached this fiduciary duty.
[¶31] The district court also found that Dr. Stevens breached his statutory duty of care, as set out in Wyo. Stat. Ann. § 17-29-409(c). This statute required him to "act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner the member reasonably believes to be in the best interests or at least not opposed to the best interests of the company." Because there are questions of fact about whether the Eye Center was a corporate opportunity and whether taking this opportunity was competing with the company, there are also questions of fact about whether his actions were opposed to the best interests of the company.
[¶32] The district court also ruled that Dr. Stevens breached the statutory duty of good faith and fair dealing, as set out in Wyo. Stat. Ann. § 17-29-409(d). The covenant of good faith and fair dealing:
[R]equires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party .... The purpose, intentions and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.
*1283 White v. Shane Edeburn Const., LLC , 2012 WY 118, ¶ 20, 285 P.3d 949, 955 (Wyo. 2012). In this case, the parties' common purpose was to share in the revenue of the services that each member of ACC generated in the provision of anesthesia services. There are questions of fact about whether ACC justifiably expected to continue receiving the revenues from the Eye Center, particularly once it had notice that the arrangement between ACC and Ms. Rivers was going to come to an end. Thus, it was not appropriate to rule on summary judgment that Dr. Stevens had violated his statutory covenant of good faith and fair dealing.
2. Did ACC Approve or Ratify Dr. Stevens' Conduct or Reject the Opportunity?
[¶33] Dr. Stevens argues that even if there are no questions of fact that he had breached his fiduciary duties, there are questions of fact about whether ACC ratified his conduct or rejected the corporate opportunity. We have previously discussed what a fiduciary must show in order to establish that his actions were ratified by a company:
If the officers of a corporation exceed their authority and the act is one that could have been authorized in the first instance by the board of directors, the act may be expressly or impliedly ratified and thus be rendered just as binding as if it had been authorized when done. 2A Fletcher Cyclopedia of the Law of Private Corporations §§ 752, 762 (1992) ; Sea Lion Corp. v. Air Logistics of Alaska, Inc. , 787 P.2d 109, 116-17 (Alaska 1990). Implied ratification of a previously unauthorized act may result from 1) accepting and retaining the benefits of the act, 2) silence, acquiescence, or failure to repudiate, or 3) other affirmative acts showing an adoption of the act or contract. Fletcher Cyc. Corp. , supra , § 762, Barnes v. Treece , 15 Wash. App. 437, 549 P.2d 1152, 1157 (1976). Ratification requires full knowledge of all the material facts on the part of the corporate principal. Fletcher Cyc. Corp ., supra , § 757; see also Farmers' State Bank v. Haun , 30 Wyo. 322, 346, 222 P. 45, 53 (1924). Although actual knowledge of the act is required, directors are held to know that which they could have ascertained with slight diligence. Haun , 30 Wyo. at 349, 222 P. at 54-55. A director is chargeable with knowledge of those corporate affairs which it is his duty to know. Id. , 30 Wyo. at 349, 222 P. at 55. Whether or not ratification exists is a question of fact where more than one inference can be drawn from the evidence. Fletcher Cyc. Corp. , supra , § 781; Sea Lion Corp ., 787 P.2d at 117-18. Whether the evidence is legally sufficient to establish ratification is a question of law for the court. Fletcher Cyc. Corp ., supra , § 781. Ratification occurs as a matter of law where reasonable persons could draw only one conclusion from the evidence. Fletcher Cyc. Corp ., supra , § 781; Sea Lion Corp ., 787 P.2d at 117-18.
Lahnston v. Second Chance Ranch Co. , 968 P.2d 32, 36 (Wyo. 1998).
[¶34] It is uncontested that Dr. Stevens' actions were never authorized or ratified by formal action of the members of ACC. However, there is evidence that raises a question about whether his actions were implicitly ratified. Dr. Stevens testified that he asked Drs. Dorrough and Skolnick if they had received his email and if they had any questions about it. They told him that they had received it and everything was fine. Drs. Dorrough and Skolnick continued to sign Ms. Rivers' time cards, which did not show her work at the Eye Center. Drs. Dorrough and Skolnick received income statements for ACC that did not show the Eye Center income. For six months after ACC stopped receiving the Eye Center income, the managers were silent and did not object to Dr. Stevens' actions. This evidence, when viewed in a light most favorable to Dr. Stevens, could lead a factfinder to conclude that his conduct was ratified.
[¶35] ACC argues that there is no question of material fact about whether Dr. Stevens' conduct was ratified, because he did not make a full disclosure of all of the material facts to all of the members of ACC, as required by Wyo. Stat. Ann. § 17-29-409(f). Dr. Stevens' December 2013 email was only copied to Drs. Dorrough and Skolnick; it was not sent to the other members of ACC. In addition, the other members of ACC did not see Ms. Rivers' time cards. Thus, ACC contends that there is no question that Dr. Stevens did *1284 not make a fair disclosure to all of the members.
[¶36] However, all of the members became aware of the material facts in June of 2014. At that time, they expelled Dr. Stevens from the group, but they did not make any attempts to get the Eye Center business back. In fact, it appears from the July 2014 emails that they may have told Dr. Stevens that he could keep the Eye Center business. Viewing this evidence in a light most favorable to Dr. Stevens, there is a material question of fact about whether ACC ratified Dr. Stevens' conduct or rejected the corporate opportunity once all of the members became aware of the diversion of the Eye Center business. If ACC did ratify Dr. Stevens' conduct or reject the opportunity, it would limit the amount of damages ACC could properly recover. Therefore, we find that there were material questions of fact, and summary judgment should not have been granted.
3. Did the Arrangement Between Ms. Rivers and ACC Violate the Anti-Kickback Statute?
[¶37] Dr. Stevens alleges that the arrangement between Ms. Rivers violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(A) (2012), which makes it illegal to:
knowingly and willfully solicit[ ] or receive[ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly ... in return for referring an individual to a person for the furnishing ... of any item or service which payment may be made in whole or in part under a Federal health care program.
Dr. Stevens alleges that Ms. Rivers paid ACC an amount "wildly in excess of fair market value to induce ACC to make referrals of Medicare-reimbursable business" to her. Dr. Stevens further argues that because this arrangement or contract was illegal, it cannot be enforced, and ACC is not entitled to receive any damages.
[¶38] ACC argues that the issue of illegality was not addressed below, and it cannot now be addressed on appeal. Dr. Stevens asserts that illegality can be raised at any time, including on appeal. To support this assertion, he cites numerous cases from other jurisdictions and Williams v. Weber Mesa Ditch Extension Co., Inc. , 572 P.2d 412 (Wyo. 1977). In Williams , we upheld a district court's sua sponte determination that a contract was illegal and could not be enforced. We stated:
2A Moore's Federal Practice, ¶ 8.27(3), p. 1854, declares that even though not specially pleaded, if illegality appears on the face of a contract, from the opening statement of counsel, from the plaintiff's proof, the defendant may at that time take advantage of it and, if necessary, the court will raise the objection itself. No court will allow itself to be used in aid of any of the parties to an illegal agreement. This rule applies to any agreement which is illegal, immoral, against public law or is forbidden by statute. In Oscanyan v. Arms Company , 103 U.S. 261, 267-268, (1880), 13 Otto 261, 26 L.Ed. 539, it was declared that the illegality could not be waived by any system of pleading, not even by stipulation of the parties.
Williams , 572 P.2d at 414.
[¶39] We do not address issues that were not raised below, unless it involves fundamental constitutional questions or the trial court's subject matter jurisdiction. See, e.g. , Burg v. Ruby Drilling Co., Inc. , 783 P.2d 144, 151 (Wyo. 1989). However, the issue of illegality was raised below, albeit belatedly. The district court declined to address it, because it found that it had been raised in bad faith. As discussed above, a judgment as a matter of law is only appropriate when reasonable jurors could reach but one conclusion as to the verdict. Hatch , 930 P.2d at 395. No evidence was presented to the jury relating to this issue. Because of the belated manner in which it was raised, we decline to address it further. Rather, upon remand, the district court may more adequately address it if properly raised at the trial court level.
4. Was Summary Judgment Properly Granted on the Defamation Counterclaim?
[¶40] In Wyoming, a defamatory statement is one that: 1) tends to hold the plaintiff up to hatred, contempt, ridicule, or scorn; 2) causes the plaintiff to be shunned or avoided; or 3) tends to injure the individual's reputation as to diminish the esteem, respect, *1285 goodwill, or confidence in which he is held. Lever v. Community First Bancshares, Inc. , 989 P.2d 634, 638 (Wyo. 1999). Generally, to be actionable, the defamatory or disparaging words "must affect the plaintiff in some way that is peculiarly harmful to one engaged in his trade or profession." Wilder v. Cody Country Chamber of Commerce, 868 P.2d 211, 224 (Wyo. 1994) (quoting Restatement (Second) of Torts § 573 at 194, cmt. e. (1977) ). However, we have also held that there is a certain category of defamatory statements that are actionable absent proof of special damages:
Defamation per se means "a statement which is defamatory on its face and, therefore, actionable without proof of special damages." 50 Am. Jur. 2d Libel and Slander § 134 at 430 (1995). The only statements classified as defamatory per se or damaging on their face, and which therefore do not require proof of special harm, are those which impute (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with business, trade, profession, or office; or (4) serious sexual misconduct. 3 Restatement (Second) of Torts, supra at §§ 570, 575.
Hoblyn v. Johnson , 2002 WY 152, ¶ 41, 55 P.3d 1219, 1233 (Wyo. 2002).
[¶41] A statement that would otherwise be defamation per se may not be actionable if it was made pursuant to a conditional privilege. "In those cases where one person has an interest in the subject matter of the communication and the person to whom the communication is made has a corresponding interest, every communication honestly made in order to protect such common interest is privileged by reason of the occasion." Sylvester v. Armstrong , 53 Wyo. 382, 84 P.2d 729, 732 (1938) (quoting Newell, Slander & Libel § 432 (4th ed.) ). "Malice is a necessary element to move the communication out from under the protective doctrine of conditionally privileged communication." Lever , 989 P.2d at 639. Under the doctrine of conditionally privileged communication, an absence of malice is presumed, and malice on the part of a defendant must be established by a plaintiff. Id. at 638 ; see also Sylvester , 84 P.2d at 733 ("The communication in such case will, prima facie, be considered as having been made in good faith-i.e., without malice, and the burden of proving the existence of malice is cast upon the person claiming to have been defamed.").
[¶42] The conditional privilege may be lost in several ways. For example, the privilege may be lost if the statement is published without reasonable grounds for belief in its truth; knowledge or reckless disregard as to the falsity of the defamatory matter; by the publication of the defamatory matter for some improper purpose; by excessive publication; or by the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged. See Restatement (Second) of Torts § 596, cmt. a.
[¶43] In this case, the exact wording of Dr. Dorrough's statement is unclear. However, it is apparent that he told other members of ACC that Dr. Stevens had diverted the business from the Eye Center without notice, and that after speaking with Dr. Dorrough, these members believed that Dr. Stevens had committed a crime. The district court held that this statement was subject to a conditional privilege, because it was a statement to his business partners about a subject in which they had a common interest.
[¶44] On appeal, Dr. Stevens alleges that the conditional privilege should have been lost, because the statement was made either with malice or with reckless disregard as to the falsity of the statement. On appeal, Dr. Stevens does not seem to be arguing that Dr. Dorrough should not have told the members of ACC that the income had been diverted, but rather that he should have told the members that Dr. Stevens did notify Drs. Dorrough and Skolnick of his intentions before the income was diverted. He points out that he and Dr. Dorrough discussed the December 2013 email prior to Dr. Dorrough's discussion with the other members of ACC. He argues that Dr. Dorrough told the members that Dr. Stevens acted without notice, when he knew this to be false. Dr. Stevens further asserts that Dr. Dorrough was trying to hide the fact that he had not read the email at the time it was sent, which may have been a violation of his own fiduciary duties to the company.
*1286 [¶45] Even assuming that Dr. Dorrough's statement was defamation per se , it was made to his business partners and it pertained to a subject about which they had a common interest. Thus, it was subject to a conditional privilege. Further, there are no materials of record which show that Dr. Dorrough acted with malice or that he knowingly made a false statement. Dr. Dorrough's statement was honestly made, and the information was not disclosed to anyone outside of ACC. As a manager of ACC, Dr. Dorrough may have even had an obligation to disclose Dr. Stevens' conduct to the other members of ACC. In addition, it is clear from the record that Dr. Dorrough honestly believed Dr. Stevens had acted without giving notice to ACC, and that his conduct was possibly criminal. Therefore, Dr. Dorrough's statement was honestly made subject to a conditional privilege, and it was appropriate to grant summary judgment on this claim.
5. Was it Prejudicial Error to Exclude the Emails?
[¶46] Dr. Stevens argues that it was prejudicial error for the district court to refuse to admit the December 2013 and July 2014 emails. Dr. Stevens wanted to admit the December 2013 email to show the jury that Dr. Stevens had notified the managers of ACC before he diverted the revenue from the Eye Center. ACC objected to the exhibit, because the district court had already granted summary judgment on the issue of liability, and this email was irrelevant to the issue of damages. The district court agreed that the document was irrelevant, and it excluded the exhibit. Dr. Stevens now argues that ACC opened the door for this evidence by arguing that Dr. Stevens acted without notice to his colleagues. He asserts that when one litigant opens the door, he cannot later complain "if the opposing party introduces evidence on the same subject." Singer v. Lajaunie , 2014 WY 159, ¶ 37, 339 P.3d 277, 287 (Wyo. 2014).
[¶47] Relevance is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In this case, the only issue left for trial was damages. The district court had already ruled that Dr. Stevens acted without notice to the members of ACC. Therefore, this issue was not before the jury, and it was not error to exclude the exhibit. However, on remand, this document may be relevant to determining liability, and our decision that it was not error to exclude it during the damages trial does not mean it should be excluded if properly offered during proceedings on remand.
[¶48] At trial, Dr. Stevens offered the July 2014 emails to show that ACC had failed to mitigate its damages. He argued that the email showed that ACC decided not to pursue the revenue from the Eye Center after it expelled Dr. Stevens from the group, and that members of ACC had told Dr. Stevens he and Ms. Rivers could keep this income. ACC objected on the grounds that the document was hearsay. Dr. Stevens argued that the document was a party admission, and was therefore not hearsay. The district court excluded the exhibit on the grounds that it was speculative and irrelevant.
[¶49] The July 2014 emails were unquestionably relevant to the issue of damages; if ACC told Dr. Stevens that he could keep the Eye Center business after that date, it would limit the amount of damages that ACC could properly recover. If the document had been admitted, the jury could have decided how much weight it should have been given. Therefore, it was error for the district court to exclude this document. Because this case is being remanded for further proceedings, we do not need to determine if excluding the document was prejudicial error.
CONCLUSION
[¶50] There were material questions of fact such that it was improper to grant summary judgment on ACC's claims. However, there were no material questions of fact surrounding the defamation counterclaim, and summary judgment was appropriately granted on that claim. It was also error to exclude the July 2014 emails. We therefore affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

The Court notes that due to the manner in which Plaintiff presented its theory of damages combined with the way the jury was instructed and the format of the verdict form, it is impossible to determine to which cause or causes of action the damages relate. It is also unclear whether the three causes of action were meant to be pled in the alternative or if ACC believed it was entitled to a separate measure of damages for each cause of action. Neither party raised this issue on appeal. However, the parties and the district court should be mindful of this issue on remand.

The Wyoming Rules of Civil Procedure were amended as of March 1, 2017, and summary judgment is now governed by W.R.C.P. 56(a). However, the summary judgment motion in this case was determined in October 2016, before the new version of the rules went into effect. Therefore, the previous version of the rules applies to our review of this case.

Dr. Stevens has argued that it was Ms. Rivers who decided to keep the revenue from the Eye Center and that she was free to do so. Some of the members of ACC admitted in their depositions that Ms. Rivers was free to stop working for ACC at any time. The Court notes that this argument seems to be inconsistent with his argument that he gave Drs. Dorrough and Skolnick notice that he would be carving out the work at the Eye Center.