# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 67

APRIL TERM, A.D. 2020

June 2, 2020

ANESTHESIOLOGY CONSULTANTS OF
CHEYENNE, LLC,

Appellant
(Plaintiff),

v.

S-19-0210

RONALD E. STEVENS, M.D., and HIGH
PLAINS ANESTHESIA, P.C., a Wyoming
Professional Corporation,

Appellees
(Defendants).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
    Henry F. Bailey Jr. and Ronald Jay Lopez, Bailey Stock Harmon Cottam Lopez,
    LLP, Cheyenne, Wyoming.  Argument by Mr. Bailey.

*Representing Appellee:*
    J. Kent Rutledge, Corinne E. Rutledge and Meri V. Geringer, Lathrop & Rutledge,
    P.C., Cheyenne Wyoming.  Argument by Mr. Rutledge and Ms. Geringer.

*Before FOX, BOOMGAARDEN, and GRAY, JJ. and SNYDER, CONDER, D.J.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.
Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne,
Wyoming 82002, of any typographical or other formal errors so that correction may be made before
final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]   We review this case for a second time.  Anesthesiology Consultants of Cheyenne, LLC (ACC) claims its former manager and member, Dr. Ronald E. Stevens, took for himself ACC's business opportunity to provide anesthesiology services to Cheyenne Eye Surgery Center (the Eye Surgery Center).  *See Stevens v. Anesthesiology Consultants of Cheyenne, LLC*, 2018 WY 45, 415 P.3d 1270 (Wyo. 2018) (*Stevens I*).  In *Stevens I*, we concluded the district court improperly granted ACC summary judgment because genuine issues of material fact existed as to ACC's breach of fiduciary duties and covenant of good faith and fair dealing claims.  *Id.*  We therefore remanded for further proceedings.  *Id.*

[¶2]   A seven-day jury trial commenced following remand.  The jury considered ACC's claims for breach of fiduciary duties, breach of the covenant of good faith and fair dealing, and—over ACC's objection—breach of contract.  ACC appeals the jury's verdict in favor of Dr. Stevens on all claims.  We affirm.

## ISSUES

[¶3]   The dispositive issues are:

    I.    Whether sufficient evidence supports the jury's verdict that Dr. Stevens did not breach his fiduciary duties of loyalty and care or the covenant of good faith and fair dealing.

    II.    Whether the district court properly submitted ACC's breach of contract claim to the jury.

## FACTS

[¶4]   We stated the basic facts in *Stevens I*.

> In 1999, a group of anesthesiologists in Cheyenne formed [ACC].  The members of ACC typically provided anesthesiology services at Cheyenne Regional Medical Center [(the Hospital)] and High Plains Surgery Center [(the Surgery Center)].  ACC also provided services to a group of Cheyenne ophthalmologists, who generally performed surgery on their patients at either [the Hospital] or [the] Surgery Center.  Some of the members of ACC had performed anesthesiology services for the ophthalmologists even before 1999.

1

[] Dr. Ronald Stevens[] joined ACC in 2001. Dr. Stevens had previously been an anesthesiologist in Denver, Colorado, and he had been a manager of a much larger group of anesthesiologists in that state before relocating his practice to Cheyenne. Shortly after moving to Cheyenne, Dr. Stevens met Cassandra Rivers. Ms. Rivers is a certified registered nurse anesthetist ("CRNA"). Ms. Rivers often performed work for ACC at [the Hospital], but she did not have a written contract with the company. Dr. Stevens and Ms. Rivers married in 2005.

In 2007, several of Cheyenne's ophthalmologists decided to open their own eye surgery center. Dr. Stevens, Ms. Rivers, and possibly other members of ACC assisted the eye surgeons in selecting the proper equipment and setting up their surgery center. The [] Eye Surgery Center [] opened in 2008. ACC initially provided anesthesia services at [the Eye Surgery Center] after it opened. However, ACC also had a contract with [the Hospital] that required it to provide a certain number of physicians and/or CRNAs who would be available to cover the [H]ospital's anesthesiology cases. Thus, it was sometimes difficult to have enough anesthesiologists to provide coverage for [the Hospital], [the] Surgery Center, and [the Eye Surgery Center]. This meant that some cases at [the Eye Surgery Center] were missed. Around the time [the Eye Surgery Center] opened, Ms. Rivers was looking for a position that would give her shorter hours. Dr. Stevens suggested to the members of ACC that Ms. Rivers provide services at [the Eye Surgery Center] when needed, and continue to work at [the Hospital] a couple of days each week. ACC would bill for her work there, pay her an hourly rate, and keep the rest of the income. ACC accepted this arrangement, and Ms. Rivers started providing services at [the Eye Surgery Center] in April of 2008. Ms. Rivers was scheduled to be at [the Eye Surgery Center] three days a week and at the [H]ospital the other two days. There was no written agreement either between ACC and [the Eye Surgery Center] or between ACC and Ms. Rivers. However, for the next several years, ACC billed for Ms. Rivers' services at [the Eye Surgery Center], paid her an hourly rate, and kept the rest of the income. On average, ACC kept slightly more than half of the income that was generated at [the Eye Surgery Center].

ACC gave Ms. Rivers minimal, if any benefits, other than providing billing services. Ms. Rivers' work was directly supervised by the ophthalmologists at [the Eye Surgery Center]. In May 2009, Ms. Rivers became an employee of Dr. Stevens' company, High Plains Anesthesia, P.C. When this change occurred, ACC paid Ms. Rivers' hourly wage to High Plains Anesthesia instead of directly to Ms. Rivers. High Plains Anesthesia then paid Ms. Rivers an hourly rate. High Plains Anesthesia paid Ms. Rivers' worker's compensation and unemployment premiums and it issued her a W-2 for the income she received. ACC continued to retain roughly half of the income from the services Ms. Rivers provided at [the Eye Surgery Center].

*Stevens I*, ¶¶ 3–6, 415 P.3d at 1274–75.

[¶5] Facts pertaining to ACC's 2013 Restated Operating Agreement and separate Distribution Agreement (collectively, the Operational Agreements) are central to this appeal. The Restated Operating Agreement outlined the members' and managers' rights and obligations and required ACC to distribute available cash to the members according to the Distribution Agreement. The Distribution Agreement set the number of units assigned to each anesthesia service and valued each unit at approximately $26. Together, the Operational Agreements required each member to assign his benefits—wherever earned— to ACC, which ACC then pooled and distributed, biweekly, according to the number of units each member provided during that period.[1] ACC distributed any remaining income on a quarterly and yearly basis. This system "allow[ed] the physicians to share in the available revenue and eliminated any incentive to avoid patients in low-paying categories or to seek out only the best paying cases." *Id.* ¶ 7, 415 P.3d at 1275.

[¶6] Some ACC members, including Dr. Stevens, provided low-paying pain management services. Pain management was less profitable because it primarily served Medicare patients, and Medicare only partially reimbursed the service's cost. Because the biweekly distribution attributable to pain management units exceeded the revenue ultimately collected for those units, the quarterly and yearly distributions were reduced, accordingly. Noticing this reduction, ACC member Dr. Robert Whiteford proposed that ACC "divorce" the pain management services from its pooling agreement to boost individual distributions.

---

[1] Benefits are the revenue a healthcare provider is entitled to earn after performing a "unit" of healthcare services. The American Society of Anesthesiologists assigns a number of units to each anesthesia service, and the anesthesia provider sets his price per unit. A provider may directly receive or assign those benefits to an entity.

[¶7]    ACC met to consider Dr. Whiteford's proposal on November 25, 2013. Dr. Stevens took the position that simply "divorcing" the pain management services would breach the Operational Agreements. As an alternative to Dr. Whiteford's proposal, Dr. Stevens suggested ACC could effectively exclude the pain management services without breaching either agreement by amending the Operational Agreements to pool only that income derived from the Hospital contract. Dr. Stevens and ACC take different positions on whether or how ACC resolved this issue that day, but Ms. Rivers reassigned her Eye Surgery Center benefits from ACC to High Plains Anesthesia less than two months later, in January 2014. Over six months later, after noticing ACC was no longer receiving income from the Eye Surgery Center, ACC notified Ms. Rivers it no longer required her services at the Hospital and expelled Dr. Stevens from ACC.

[¶8]    ACC sued Dr. Stevens and Ms. Rivers in February 2015, claiming breach of fiduciary duties, breach of the covenant of good faith and fair dealing, and breach of contract, among other claims. ACC successfully moved for summary judgment on those three claims. Dr. Stevens appealed the district court's summary judgment as to his violation of fiduciary duties and covenant of good faith and fair dealing. *Id.* ¶ 2, 415 P.3d at 1273–74.

[¶9]    We held that issues of material fact existed as to ACC's claims for breach of fiduciary duties and the covenant of good faith and fair dealing. *Id.* ¶¶ 27–32, 415 P.3d at 1280–83. The record raised questions of fact as to whether: the Eye Surgery Center was ACC's business opportunity; ACC had an actual or expected interest in the Eye Surgery Center; ACC had the financial ability to avail itself of the Eye Surgery Center business opportunity; Dr. Stevens taking the Eye Surgery Center business opportunity could constitute competition with ACC; and, Dr. Stevens' actions were opposed to ACC's best interests. *Id.* ¶¶ 29–31, 415 P.3d at 1281–82. Regarding ACC's breach of the covenant of good faith and fair dealing claim, we noted that ACC's "common purpose was to share in the revenue" each ACC member generated by providing anesthesia services, and that issues of material fact existed as to whether ACC could justifiably expect to continue receiving revenue Ms. Rivers derived from the Eye Surgery Center. *Id.* ¶ 32, 415 P.3d at 1282–83.

[¶10]  The case proceeded to trial. The district court submitted to the jury ACC's claims for breach of fiduciary duties, covenant of good faith and fair dealing, and—over ACC's objection—breach of contract. The jury returned the special verdict form, in relevant part:

>     1.    Did Defendant, Ronald E. Stevens, M.D. breach the
>     ACC Operating Agreement?                    Yes      No  X
>
>      . . . .
>
>     3.    Was providing anesthesia services at Cheyenne Eye
>     Surgery Clinic a business opportunity which Plaintiff

4

Anesthesiology Consultants of Cheyenne, LLC, could have availed itself of?                    Yes _X_ No

Did Defendant, Ronald E. Stevens M.D., breach his fiduciary duty of loyalty to Plaintiff ACC?        Yes       No _X_

. . . .

5.      Did Defendant, Ronald E. Stevens M.D., breach his fiduciary duty of care to Plaintiff ACC?       Yes       No _X_

. . . .

7.      Did Defendant Ronald E. Stevens M.D., breach the duty of good faith and fair dealing that he owed to Plaintiff ACC?
                                                  Yes       No _X_

In other words, the jury returned a verdict in Dr. Stevens' favor, finding ACC could have availed itself of the Eye Surgery Center business opportunity, but Dr. Stevens did not breach the operating agreement, his fiduciary duties, or the covenant of good faith and fair dealing. We discuss additional facts below as necessary.

### DISCUSSION

### I.      *Sufficient evidence supports the jury's verdict.*

[¶11]   ACC argues the jury had to find Dr. Stevens breached his fiduciary duties and the covenant of good faith and fair dealing because it found that the Eye Surgery Center was a business opportunity ACC could have availed itself of. To the extent ACC is arguing the verdict is inconsistent or jury findings three, five, and seven are irreconcilable, ACC has waived that argument. *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1284 (Wyo. 1983) ("We have previously ruled that challenges to irregular or inconsistent verdicts may be waived by the failure to object before the discharge of a jury."). We instead construe ACC's argument as a challenge to the sufficiency of the evidence to support the jury's findings that Dr. Stevens breached neither his fiduciary duties nor the covenant of good faith and fair dealing.

[¶12]   "[W]e apply our traditional standard for reviewing claims that sufficient evidence was not presented at the trial to support the jury's verdict." *Lane v. Yearsley*, 938 P.2d 858, 859 (Wyo. 1997); *see also Francis v. Pountney*, 972 P.2d 143, 145 (Wyo. 1999).

> On review, this [C]ourt assumes that the evidence in favor of the successful party is true. We leave out of consideration

entirely the evidence presented by the unsuccessful party that conflicts with the evidence of the successful party, and we afford to the evidence of the successful party every favorable inference that may be reasonably and fairly drawn from it.

*Francis*, 972 P.2d at 145 (quoting *Kadrmas v. Valley West Homeowner's Association*, 848 P.2d 826, 828 (Wyo. 1993)). "[W]e leave to the jury the duty of ascertaining the facts, reconciling conflict therein and drawing its own inferences if more than one inference is permissible." *Medlock v. Merrick*, 786 P.2d 881, 883 (Wyo. 1990) (quoting *Crown Cork & Seal Company, Inc. v. Admiral Beverage Corp.*, 638 P.2d 1272, 1274-75 (Wyo. 1982)). The jury "is not required to accept a plaintiff's version of the facts," and "we will not disturb [its] findings even if we might have reached a different result." *Id.* at 884 (citing *Kahler v. Martin*, 570 P.2d 720 (Wyo. 1977); *Jones v. Sheridan County School District # 2*, 731 P.2d 29 (Wyo. 1987)).

[¶13]   Dr. Stevens served as ACC's manager during all times relevant to ACC's claims. As ACC's manager, Dr. Stevens was bound by the fiduciary duties of loyalty and care, as well as the covenant of good faith and fair dealing. ACC's Operating Agreement incorporated the statutory standards of conduct, with no material changes or additions. Dr. Stevens was thus required "to conduct business in a manner that [he] reasonably believe[d] to be in the best interests or not opposed to the best interests of the company, to refrain from competing with the limited liability company, and to act in good faith." *Acorn v. Moncecchi*, 2016 WY 124, ¶ 35, 386 P.3d 739, 752 (Wyo. 2016) (citing Wyo. Stat. Ann. § 17-29-409(c) and (d) (LexisNexis 2019)); *see also* Wyo. Stat. Ann. § 17-29-409(b)(iii) (statutory duty of loyalty), (c) (statutory duty of care), (d) (statutorily implied covenant of good faith and fair dealing). Notably, however, a verdict in ACC's favor required the jury to find ACC had an actual, practical and justified expectation in the Eye Surgery Center opportunity. *See Stevens I*, ¶ 28, 415 P.3d at 1281 (citing *Acorn*, ¶ 49, 386 P.3d at 754–55) ("a party claiming breach of fiduciary duty through the appropriation of a business opportunity must establish that it had an actual or expected interest in an asset"); *see also White v. Shane Edeburn Const., LLC*, 2012 WY 118, ¶ 20, 285 P.3d 949, 955 (Wyo. 2012) (quoting *M & M Auto Outlet v. Hill Inv. Corp.*, 2010 WY 56, ¶ 26, 230 P.3d 1099, 1108 (Wyo. 2010)) (the covenant of good faith and fair dealing "requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party").

[¶14]   The district court instructed the jury on these matters without objection from either party. It instructed the jury that to find Dr. Stevens breached a "fiduciary duty by appropriation of the Eye Surgery Center business opportunity," ACC had to prove by a preponderance of the evidence both

> 1. That it had an actual or expected interest in the
> Eye Surgery Center business; and

6

2. That it had the financial ability to avail itself of this opportunity without the participation of CRNA Rivers.

Even though a company might have had some rights with regard to a business opportunity, in order for that opportunity to be usurped, the acquisition must have been within the company's expectation. To establish an expectancy, it is not sufficient for the company to show only that a proposed opportunity possesses value to it, but the company must also show that there is a practical, and not a mere theoretical basis for the opportunity.

[¶15] The court further instructed the jury on how to evaluate whether Dr. Stevens violated the covenant of good faith and fair dealing:

The covenant of good faith and fair dealing requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. The purpose, intentions and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.

[¶16] In applying these instructions, the jury found that "providing anesthesia services at Cheyenne Eye Surgery Clinic" was "a business opportunity which [ACC] could have availed itself of," but that Dr. Stevens did not breach his fiduciary duties of loyalty and care, or the covenant of good faith and fair dealing. It is our task to determine whether the record supports these findings and the implied conclusions that ACC had no "practical" or "justified" expectation it would avail itself of the Eye Surgery Center business opportunity, or the financial ability to do so without Ms. Rivers.

[¶17] We begin with evidence that supports the jury's reasonable inference it was neither practical nor justifiable for ACC to expect to avail itself of the Eye Surgery Center business opportunity after the Eye Surgery Center declined to pay for part of the cost of additional anesthesiology staff. Due to its contractual obligations with the Hospital, ACC could provide the Eye Surgery Center only unreliable, intermittent anesthesia coverage—on a "catch-as-catch-can" basis. To guarantee reliable service to the Eye Surgery Center, ACC would need to hire another provider. To staff Eye Surgery Center services without incurring a financial loss, ACC requested the Eye Surgery Center to pay an additional $100 per-case stipend. The Eye Surgery Center declined to pay the stipend and, reasoning ACC would not be its provider, sought out other anesthesia providers.

7

[¶18]  Ms. Rivers, acting independently, became the Eye Surgery Center's primary anesthesia provider.  Dr. Randolph Johnston, the surgeon leading the Eye Surgery Center's anesthesia provider search, testified that he approached Ms. Rivers directly after contacting other local and national anesthesia groups.  He believed Ms. Rivers provided the Eye Surgery Center anesthesia coverage in her individual capacity and never felt Ms. Rivers was ACC's representative or employee.  Ms. Rivers confirmed Dr. Johnston's testimony, and added that she worked at the Eye Surgery Center as an independent contractor, but initially assigned her Eye Surgery Center benefits to ACC.[2]

[¶19]  Ms. Rivers testified she assigned her Eye Surgery Center benefits to ACC in part to take advantage of ACC's billing and collection account with a third-party.  Dr. Skolnick confirmed this was a verbal agreement Ms. Rivers could end "at any time[.]"  Based on this testimony, the jury could reasonably conclude ACC had no actual, practical or justifiable expectation it could avail itself of the Eye Surgery Center business opportunity through Ms. Rivers.  Ms. Rivers ended her agreement with ACC on January 1, 2014, when she reassigned her Eye Surgery Center benefits to High Plains Anesthesia.

[¶20]  As further indicated by an email between ACC members Drs. Michael Dorrough and David Skolnick, ACC needed the Eye Surgery Center to pay the requested per-case stipend even before Ms. Rivers reassigned her benefits to High Plains Anesthesia. This evidence, together with ACC's recognition that low-paying Medicare insurance covered more than half of the Eye Surgery Center's patients, further supports the jury's conclusion that ACC had no practical or justified expectation it would avail itself of the Eye Surgery Center business opportunity.  The jury could also rely on this evidence to reasonably conclude ACC lacked the financial ability to avail itself of the Eye Surgery Center business opportunity with or without Ms. Rivers.[3]

[¶21]  The jury may also have believed Dr. Stevens when he testified that ACC amended the Operational Agreements to pool only that income each member derived from the Hospital contract.  Recall ACC met in November 2013 to consider the proposal to divorce members' pain management services from the pooling agreement.  Dr. Stevens testified he told the members the divorce proposal would breach the Operational Agreements.  He then proposed that ACC could accomplish the same objective without breaching the Operational Agreements if it amended the agreements to apply only to the Hospital contract—thus requiring the members to pool *only* their income derived from services rendered at the Hospital and Surgery Center.  Dr. Stevens testified the group unanimously adopted his

---

[2] The Eye Surgery Center drafted a contract which, although unsigned, further showed ACC had no part of Ms. Rivers' provision of services to the Eye Surgery Center.  Dr. Johnston and Ms. Rivers testified that the unsigned contract adequately reflected her professional relationship with the Eye Surgery Center.

[3] The email acknowledged that "in order to make [the Eye Surgery Center] profitable for [ACC], [ACC] would have to recruit another CRNA.  If [ACC had] to bring in more locums in order to keep [the Eye Surgery Center] staffed, it may not be much of a benefit to [ACC] . . . (Locums might be $2,000/day and [the Eye Surgery Center] is worth about $1300/day)."

proposal by a "show of hands[.]" He confirmed his understanding of the amendment in an email to Drs. Dorrough and Skolnick in December. If the jury found Dr. Stevens' account of this meeting credible, it could reasonably conclude ACC had no practical or justifiable interest in revenue from the Eye Surgery Center, and Dr. Stevens' actions were not inconsistent with the agreed common purpose and justified expectations of ACC.

[¶22]   Assuming as we must this evidence is true, *Francis*, 972 P.2d at 145, and giving Dr. Stevens the benefit of every favorable inference that can reasonably and fairly be drawn from it, the jury could reasonably find that any "practical" or "justified" expectation, or financial ability ACC may have had to avail itself of the Eye Surgery Center business opportunity was dashed when the Eye Surgery Center declined to pay an additional per-case stipend. In the alternative or in addition, the jury could have found that ACC's expectations and financial ability to avail itself of the Eye Surgery Center opportunity vanished when ACC amended the Operational Agreements to pool and distribute only that revenue ACC members derived from the Hospital and its Surgery Center. Sufficient evidence therefore supports the jury's verdict that Dr. Stevens did not breach his fiduciary duties or the covenant of good faith and fair dealing.[4]   *Id.*

## II.     The law of the case doctrine does not apply to ACC's breach of contract claim.

[¶23]   Because Dr. Stevens did not appeal the district court's summary judgment order on ACC's breach of contract claim in *Stevens I*, ACC argues that ruling remained in force and effect following remand, and the district court erred when it submitted the breach of contract claim to the jury. ACC cites no pertinent authority to support its argument. However, based on its objection raised below, we interpret ACC's claimed error to assert law of the case principles. The law of the case doctrine provides that "a court's decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation." *BTU Western Res., Inc. v. Berenergy Corp.*, 2019 WY 57, ¶ 26, 442 P.3d 50, 58 (Wyo. 2019) (quoting *Triton Coal Co. v. Husman, Inc.*, 846 P.2d 664, 667 (Wyo. 1993)); *see also Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) (citation omitted) (the doctrine "preclud[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court."). We consider whether the doctrine applies to ACC's breach of contract claim de novo. *See BTU Western Res. Inc.*, ¶¶ 28–35, 442 P.3d at 58–60; *see also Triton Coal Co.*, 846 P.2d at 667–70.

[¶24]   We begin with the premise "an appeal from a part of a judgment can be taken only if the appealed portion is severable[,]" because that rule impacts the preclusive effect on unappealed issues. *Triton Coal Co.*, 846 P.2d at 669; *see also BTU Western Res., Inc.*,

---

[4] As the evidence is sufficient to support the jury's findings that Dr. Stevens did not breach his fiduciary duties or the covenant of good faith and fair dealing, we need not reach ACC's argument that ACC never authorized or ratified Dr. Stevens' alleged breaches. *See* Wyo. Stat. Ann. § 17-29-409(f).

¶ 28, 442 P.3d at 58. "In cases where the appealed judgment is not independent from the remainder, the appeal becomes an appeal from the whole judgment, and, consequently, a reversal will extend to the whole judgment." *BTU Western Res., Inc.*, ¶ 28, 442 P.3d at 58 (citing *Triton Coal Co.*, 846 P.2d at 669).

> The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is ***whether the matters or issues embraced therein are the same as, or interdependent upon, the matters or issues which have not been attacked. [I]n order to be severable, and therefore appealable, any determination of the issues so settled by the judgment . . . must not affect the determination of the remaining issues whether such judgment on appeal is reversed or affirmed***.

*Id.* ¶ 29, 442 P.3d at 58–59 (quoting *Triton Coal Co.*, 846 P.2d at 669) (emphasis in original). Under this rule, if the matters or issues embraced in ACC's breach of fiduciary duties and covenant of good faith and fair dealing claims are the same as the matters or issues embraced in ACC's breach of contract claim, then *Stevens I* extended to ACC's breach of contract claim and the law of the case doctrine does not apply. *See id.*

[¶25]  Having reviewed ACC's amended complaint, *Stevens I*, and the record before us, we easily conclude the same matters and issues are embraced within all ACC's claims— breach of fiduciary duties, breach of covenant of good faith and fair dealing, and breach of contract. The central issue in each of these claims is whether Dr. Stevens usurped ACC's business opportunity. The district court applied the same reasoning when granting ACC summary judgment on all three claims—Dr. Stevens "used his separate entity to [c]ompete with ACC, taking a longstanding business relationship and diverting revenues from ACC."

[¶26]  We recognized as much in *Stevens I* when we broadly held that genuine issues of material fact existed as to "whether taking th[e] [Eye Surgery Center] opportunity was competing with the company . . . [and] whether [Dr. Stevens'] actions were opposed to the best interests of the company." *See Stevens I*, ¶ 31, 415 P.3d at 1282. We also noted "it [was] impossible to determine to which cause or causes of action the damages relate[d]" or whether "ACC believed it was entitled to a separate measure of damages for each cause of action." *Id.* ¶ 21 n.1, 415 P.3d at 1278 n.1. ACC's breach of contract claim was not severable under these circumstances, and Dr. Stevens' appeal in *Stevens I* became an appeal of the summary judgment order in its entirety. We clearly addressed the matters and issues related to Dr. Stevens' alleged breach of contract in *Stevens I*; consequently, our reversal extended to the prior judgment on ACC's breach of contract claim. *BTU Western Res., Inc.*, ¶ 29, 442 P.3d at 58–59. For these reasons, the district court did not err in submitting the claim to the jury. *Id.*

10

## CONCLUSION

[¶27]   Sufficient evidence supports the jury's verdict that Dr. Stevens did not breach his fiduciary duties or the covenant of good faith and fair dealing.  Because the law of the case doctrine did not apply to the district court's earlier summary judgment ruling on ACC's breach of contract claim, the court properly submitted that claim to the jury.

[¶28]   Affirmed.